UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
YONG XIONG HE,

                            Plaintiff,

              - against -

CHINA NEW STAR RESTAURANT, INC.,
WAI SHUN CHAN a/k/a Vincent Chan, WAI
LEUNG CHAN, WAI WEN CHAN a/k/a
Daniel Chan, PO KUM CHAN a/k/a Po Kum
Ng, RONALD CHAN, ROY CHAN, JIAZHEN
LIAO, CHING MAN HONG CHAN a/k/a
Hong Ching Man Chan, JOSEPH CHAN, and
ELTON CHAN,

                       Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
19-CV-5907 (PKC) (CLP)

PAMELA K. CHEN, United States District Judge:

      Plaintiff Yong Xiong He brought his Original Complaint against Defendants China New

Star Restaurant, Inc. ("China New Star"), Wai Shun Chan ("Wai Shun"), Wai Leung Chan ("Wai

Leung"), and Wai Wen Chan ("Wai Wen") ("Original Defendants"), alleging violations of the Fair

Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and the New York Labor Law

("NYLL"), N.Y. Lab. Law §§ 190 *et seq.*, 650 *et seq.* (*See generally* Complaint ("Compl."), Dkt.

1.) After Original Defendants Wai Leung and Wai Shun made five transfers of property to several

family members ("New Defendants") on November 25, 2019 and November 27, 2019, Plaintiff

filed an Amended Supplemental Complaint (Dkt. 68) and a motion for an order to show cause

requesting the Court to attach these five properties and set aside and enjoin further transfers thereof

pursuant to New York Civil Practice Law and Rules ("CPLR") §§ 6212 and 6201(3) and New

York Debtor and Creditor Law ("DCL") §§ 270–81, and to order disclosure of Original Defendants

Wai Leung's and Wai Shun's assets pursuant to CPLR § 6220 (Dkt. 28). For the reasons stated

below, the Court grants in part Plaintiff's motion for an order of attachment and denies Plaintiff's request for disclosures.

## BACKGROUND

On October 18, 2019, Plaintiff brought his Original Complaint against Original Defendants, alleging violations of the FLSA and NYLL during his almost seven-year employment as a waiter at China New Star Restaurant (the "Restaurant"), which was owned, operated, and managed by Original Defendants.[1]  (Compl., Dkt. 1, ¶ 5.)  Plaintiff alleged that, during his full-time employment, Original Defendants paid Plaintiff approximately $2 per hour in violation of the federal and New York minimum wage laws and Plaintiff's entitlement to overtime pay.  (*See id.* ¶¶ 15–17 (alleging that Plaintiff was paid $110 per week for 55 hours of work), 18–32.)  Plaintiff also alleged that Original Defendants failed to comply with the NYLL's notice, recordkeeping, and wage statement requirements.  (*Id.* ¶¶ 33–41.)

Original Defendants' answers were due starting November 12, 2019 (*see* Dkts. 8–12, 18), but Original Defendants moved for an extension of time to file on November 26, 2019 (Dkt. 13). The Court granted that extension (*see* Nov. 27, 2019 Docket Order), and Original Defendants filed their Answer on December 4, 2019 (Dkt. 16), and Amended Answer on January 7, 2020 (Original Defendants' Amended Answer ("Am. Answer"), Dkt. 19).  On November 25 and November 27, 2019, around when Original Defendants requested additional time to file their answer, Wai Leung

---

[1] Plaintiff alleges that Original Defendants Wai Leung, Wai Shun, and Wai Wen all qualified as his employers within the meaning of the FLSA, 29 U.S.C. § 203(d), and NYLL, N.Y. Lab. Law §§ 190(3) and 651(6). (Compl., Dkt. 1, ¶ 12.)  Defendants acknowledge that Wai Leung was an owner, officer, and President, and Wai Shun was Vice-President, of corporate Defendant China New Star (*see* Am. Answer, Dkt. 19, ¶¶ 12–13; Wai Leung Decl., Dkt. 74-1, ¶ 2), but maintain that Wai Leung and Wai Wen were not involved in the restaurant's hiring decisions and that Wai Wen was a restaurant employee, not owner or manager, and thus Wai Leung and Wai Wen do not qualify as Plaintiff's employers for FLSA and NYLL purposes (*see* Am. Answer, Dkt. 19, ¶ 13–14).

and Wai Shun made five transfers of property to New Defendants.  (*See* Dkts. 32-2, 32-5, 32-7, 32-15, 32-18.)

    **A.**    **Property Transfers**

        1.    <u>Strickland Property</u> (6309 Strickland Ave, Brooklyn, NY)

Original Defendant Wai Leung and his wife, New Defendant Po Kum Chan ("Po Kum"), purchased the Strickland Property for $560,000 on July 10, 2007.  (Dkt. 32-1, at ECF[2] 8.)  On November 25, 2019, Wai Leung and Po Kum transferred the property to Po Kum purportedly "in consideration of ten dollars and other valuable consideration," but for a full sale price of $0.  (Dkt. 32-2, at ECF 4, 8.)

        2.    <u>Condo</u> (70 Washington Street, Unit 6Q, Brooklyn, NY)

Original Defendant Wai Leung and New Defendant Po Kum purchased the Condo for $965,000 on June 22, 2016.  (Dkt. 32-3, at ECF 9.)  On November 25, 2019, Wai Leung and Po Kum transferred the property to New Defendants Po Kum and Ronald Chan ("Ronald"), son of Wai Leung and Po Kum, purportedly "in consideration of ten dollars and other valuable consideration," but for a full sale price of $0.  (Dkt. 32-5, at ECF 4, 9.)

        3.    <u>6th Ave Property</u> (8119 6th Ave, Brooklyn, NY)

Original Defendant Wai Leung, New Defendant Po Kum, and their son, New Defendant Roy Chan ("Roy"), purchased the 6th Avenue Property for $979,000 on August 20, 2013.  (Dkt. 32-6, at ECF 7.)  On November 25, 2019, Defendants Wai Leung, Po Kum, and Roy transferred the property to New Defendants Roy and Jiazhen Liao ("Jiazhen"), Roy's wife, purportedly "in

---

    [2] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

consideration of ten dollars and other valuable consideration," but for a full sale price of $0.  (Dkt. 32-7, at ECF 4, 8.)

4.      16th Ave Property (8804 16th Ave, Brooklyn, NY)

Original Defendant Wai Shun and his wife, New Defendant Ching Man Hong Chan ("Ching Man Hong"), first acquired an interest in the 16th Avenue Property on December 22, 1988.  (Dkt. 32-10.)  On October 26, 1991, Wai Shun and Ching Man Hong transferred the property to Wai Shun "in consideration of ten dollars and other valuable consideration."  (Dkt. 32-11, at ECF 3.)  On January 27, 2010, Wai Shun transferred the property back to himself and Ching Man Hong "in consideration of Ten ($10.00) dollars" but for a full sale price of $0.  (Dkt. 32-12, at ECF 4, 7.)  On November 25, 2019, Wai Shun and Ching Man Hong transferred the property to New Defendants Ching Man Hong and Joseph Chan ("Joseph"), son of Wai Shun and Ching Man Hong, purportedly "in consideration of ten dollars and other valuable consideration," but for a full sale price of $0.  (Dkt. 32-15, at ECF 4, 7.)

5.      Li Mortgage

On September 4, 2014, non-party Kristy Ling Feng Li ("Kristy Li") purchased a property located at 7814 16th Ave, Brooklyn, NY (the "Li Property") for $900,000.  (Dkt. 32-16, at ECF 8.)  On September 17, 2019, Original Defendant China New Star sold the Restaurant to non-party Ruan New Star, Inc.[3] for $600,000, with a second mortgage of $600,000 secured against the Li Property (the "Li Mortgage").  (Dkt. 74-3, at ECF 1, 6; *see generally* Dkt. 32-17.)  Under the terms of this mortgage, Kristy Li was to make monthly payments of $6,661.23 to Original Defendants Wai Leung and Wai Shun for ten years starting on October 1, 2019.  (Dkt. 32-17, at ECF 8.)  On

---

[3] The relationship between non-party Kristy Li and non-Party Ruan New Star, Inc., whose president is Jun Sheng Ruan (Dkt. 74-3, at ECF 3), is unclear to the Court.

November 27, 2019, Wai Leung and Wai Shun assigned their interests in the Li Mortgage to New

Defendants Po Kum and Elton Chan ("Elton"), son of Wai Shun and Ching Man Hong, purportedly

"in consideration of ten ($10.00) dollars." (Dkt. 32-18, at ECF 4.) At the time of the assignment,

$592,659.23 in principal remained on the mortgage. (*Id.*)

**B.      Plaintiff's Motion**

On July 6, 2020, Plaintiff filed the instant motion for an order to show cause, seeking to

set aside the five transfers, attach those properties, enjoin further transfers thereof, and compel

disclosure of properties in which Original Defendants Wai Leung and Wai Shun have an interest,

pursuant to Federal Rules of Civil Procedure ("FRCP") 15(d), 18, 20, 21, 64, and 65, CPLR

§§ 6201(3) and 6212, and DCL §§ 270–281. (Dkt. 28; *see also* Plaintiff's Memorandum of Law

in Support of Plaintiff's Application for an Order to Attach ("Pl.'s Mem."), Dkt. 29.) Plaintiff also

requested, *inter alia*, leave to file a supplemental complaint joining New Defendants as parties and

for an order of disclosure pursuant to CPLR § 6220. (*Id.* at ECF 2, 4–5.) The Court authorized

Plaintiff leave to file supplemental pleadings on July 7, 2020. (*See* July 7, 2020 Docket Order.)

Plaintiff's Amended Supplemental Complaint ("ASC") joined the transferee family members as

New Defendants and alleged that the five properties were transferred fraudulently by Original

Defendants Wai Leung and Wai Shun with the purpose of frustrating Plaintiff's ability to

eventually collect judgment on his original FLSA and NYLL claims,[4] and sought injunctive relief.

---

[4] Plaintiff calculates his entitlement to recovery to total $599,870.85 (Second Declaration of Michael L. Winston ("Winston's Second Decl."), Dkt. 81, ¶ 9), comprising of $443,078.89 in damages including backpay for wages and overtime pay, liquidated damages, and prejudgment interest, and $156,791.96 in attorney's fees and expenses (Second Declaration of Alexander J. Ritz, Dkt. 80, ¶¶ 5, 10, 11; *see also* Dkts. 80-1, 80-2, 80-3, 80-4), of which $93,939.75 came from filing and litigating the present motion (Dkt. 80-4). Defendants requested leave to oppose Plaintiff's calculation of attorney's fees (Dkts. 85, 86) but the Court denied that request (Aug. 24, 2020 Docket Order). At this point in the litigation, the Court does not decide on the reasonableness of these claimed attorney's fees.

(Dkt. 68.)  This Court issued a temporary restraining order enjoining Defendants "from selling, transferring, conveying, assigning, or otherwise disposing" of the five properties at issue (Dkt. 38, at 5), and held a show cause hearing on August 10, 2020 (Aug. 10, 2020 Minute Entry).

## DISCUSSION

In his motion for an order to show cause, Plaintiff requests relief pursuant to FRCP 15(d), 18, 20, 21, 64, and 65, CPLR §§ 6201(3) and 6212, and DCL §§ 270–81.  (Dkt. 28; *see also* Pl.'s Mem., Dkt. 29.)  The Court interprets this motion as a request to attach the properties pursuant to FRCP 64 and the CPLR §§ 6201(3) and 6212, and for injunctive relief undoing the transfers thereof pursuant to FRCP 65 and the DCL §§ 270–81.  For the reasons stated below, the Court attaches three of the properties pursuant to FRCP 64 and the CPLR §§ 6201(3) and 6212, but does not undo the conveyance thereof pursuant to FRCP 65 and the DCL.  The Court declines to order disclosure pursuant to CPLR § 6220.

## I.      Subject Matter Jurisdiction

New Defendants first contend that this Court lacks, or in the alternative should decline to exercise, jurisdiction over Plaintiff's request for attachment and injunctive relief because the CPLR and DCL claims are unrelated to, and will predominate over, Plaintiff's original FLSA claims.  (*See* New Defendants Po Kum, Ronald, Roy & Jiazhen's Memorandum of Law in Opposition to Plaintiff's Application for an Order to Attach ("New Defs.' Mem."), Dkt. 70, at 6–8; Declaration in Opposition ("Brostowin Decl."), Dkt. 75, at 8–9.)  This argument lacks merit.  A federal court may "exercise ancillary jurisdiction over . . . those claims and actions which are necessary to effectuate its own judgments."  *Village of West Hampton Dunes v. New York*, 89 F. Supp. 3d 433, 443 (E.D.N.Y. 2015).  "Without jurisdiction to enforce a judgment entered by a federal court, 'the judicial power would be incomplete and entirely inadequate to the purposes for which it was

6

conferred by the Constitution.'"  *Winter v. Novartis Pharm. Corp.*, 39 F. Supp. 3d 348, 351 (E.D.N.Y. 2014) (quoting *Peacock v. Thomas*, 516 U.S. 349, 356 (1996)).

Here, the Court has subject matter jurisdiction over Plaintiff's original FLSA and NYLL claims.  *See, e.g.*, *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 83 (2d Cir. 2018) (noting that "it is indisputable that the District Court possessed supplemental jurisdiction" over NYLL claims arising out of the same facts as FLSA claims).  Indeed, Defendants do not dispute the Court's jurisdiction over the original action.  (*See* New Defs.' Mem., Dkt. 70, at 6; Brostowin Decl., Dkt. 75, at 8; *see also* Am. Answer, Dkt. 19, ¶¶ 46–67 (raising eight affirmative defenses, none of which assert lack of subject matter jurisdiction); Original Defendants' Amended Answer to ASC ("ASC Am. Answer"), Dkt. 91, ¶¶ 55–70 same).)  Plaintiff brings CPLR and DCL claims in his ASC under the theory that he may be hindered from collecting on any judgment issued in his FLSA and NYLL action without an attachment order preventing Defendants from disposing of the five properties.  (*See* ASC, Dkt. 68, ¶¶ 24, 28, 32, 36, 40.)  Adjudicating these attachment and fraudulent conveyance claims thus falls squarely within the Court's ancillary enforcement jurisdiction.  *See Kim v. Yoo*, 776 F. App'x 16, 20 (2d Cir. 2019) (summary order) (holding that a DCL fraudulent conveyance claim made to enforce a FLSA judgment is "[a]n ancillary action" that "does not require an independent basis for jurisdiction" (citing *Epperson v. Entm't Express, Inc.*, 242 F.3d 100, 104 (2d Cir. 2001)).

## II.  The Court's Authority to Grant the Requested Relief

New Defendants next argue that *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc. ("Grupo Mexicano")*, 527 U.S. 308 (1999) bars the Court from granting Plaintiff's requested relief because "Plaintiff's claims pursuant to [the] DCL and CPLR [§] 6201 are not ancillary to Plaintiff's claim[s] against Original Defendants pursuant to the FLSA and NYLL."

(New Defs.' Mem., Dkt. 70, at 23.)  This argument misunderstands the legal standard.  In *Grupo Mexicano*, the Supreme Court held that a "district court is without power pursuant to Federal Rule of Civil Procedure 65 to order injunctive relief preventing [a] party from disposing of assets pending adjudication of contract claims for money damages."  *ContiChem LPG v. Parsons Shipping Co.*, 229 F.3d 426, 430 (2d Cir. 2000) (citing *Grupo Mexicano*, 527 U.S. at 333).  But, by its terms, *Grupo Mexicano* does not implicate the Court's authority to issue attachment remedies pursuant to FRCP 64.  In explaining its reversal of the order granting a prejudgment asset freeze, the Supreme Court noted that issuing the preliminary injunction "could render Federal Rule of Civil Procedure 64, which authorizes use of state prejudgment remedies, a virtual irrelevance."  *Grupo Mexicano*, 527 U.S. at 330.  *Grupo Mexicano* thus presupposes federal courts' authority to employ state attachment remedies pursuant to FRCP 64, as Plaintiff requests here.[5]  *See also Coley*

---

[5]  *Grupo Mexicano* also would not bar the Court from issuing a preliminary injunction pursuant to FRCP 65 when that relief is ancillary to the equitable relief being sought.  *See Gucci Am., Inc. v. Li*, 768 F.3d 122, 131 (2d Cir. 2014) ("But [federal courts] maintain the equitable power to [issue a prejudgment asset freeze] where such relief was traditionally available: where the plaintiff is pursuing a claim for final equitable relief, and the preliminary injunction is ancillary to the final relief." (citation omitted)).  Based on this reasoning, most courts require a "nexus" between the injunctive relief requested and the equitable relief ultimately sought.  *See, e.g.*, *Shamrock Power Sales, LLC v. Scherer*, No. 12-CV-8959 (KMK) (JCM), 2016 WL 6102370, at *6 (S.D.N.Y. Oct. 18, 2016) (discussing and applying this requirement).  "To establish that such a 'nexus' exists, the party seeking an injunction must show that the 'injunction acts in aid of the recovery sought in equity,'—in other words, that the preliminary injunction is reasonably necessary to preserve the status quo with respect to particular assets so that the court can grant the movant ultimate relief."  *New Falls Corp. v. Soni Holdings, LLC*, No. 19-CV-449 (AKT), 2019 WL 4015170, at *10 (E.D.N.Y. July 5, 2019) (quoting *Shamrock Power Sales, LLC*, 2016 WL 6102370, at *5–6), *report and recommendation adopted*, No. 19-CV-00449 (ADS) (AKT), 2019 WL 3712127 (E.D.N.Y. Aug. 7, 2019).

Here, Plaintiff seeks damages for his FLSA and NYLL claims, but he also seeks equitable relief pursuant to the DCL §§ 279(a), (c), and (d).  (*See* ASC, Dkt. 67, ¶¶ 23–47.)  "[A] number of courts have recognized that the *Grupo Mexicano* rule 'exempts from its proscription against preliminary injunctions freezing assets in cases involving . . . fraudulent conveyances.'"  *Dong v. Miller*, No. 16-CV-5836 (NGG) (JO), 2018 WL 1445573, at *9 (E.D.N.Y. Mar. 23, 2018) (quoting *Iantosca v. Step Plan Servs., Inc.*, 604 F.3d 24, 33 (1st Cir. 2010))); *see also id.* (collecting cases).  Applying this exemption here comports with the Supreme Court's reasoning in *Grupo Mexicano*,

*v. Vannguard Urb. Improvement Ass'n, Inc.*, 16-CV-7217641 (PKC) (RER), 2016 WL 7217641,

at *15 (E.D.N.Y. Dec. 13, 2016) (issuing an attachment order pursuant to FRCP 64 and CPLR

§§ 6201(3) and 6212, despite finding that *Grupo Mexicano* barred injunctive relief pursuant to

FRCP 65), *as amended* (Mar. 29, 2018); *Bollenbach v. Haynes*, No. 18-CV-997, 2018 WL

4278347, at *1 n.1 (S.D.N.Y. May 29, 2018) (noting that "*Grupo Mexicano* is inapplicable . . .

because [Plaintiff] does not invoke [FRCP] 65 as a basis for the temporary restraining order, but

instead relies solely on [the] CPLR" and FRCP 64).

III.     **Attachment Pursuant to CPLR §§ 6201(3) and 6212(a)**

"Federal Rule of Civil Procedure 64 permits federal litigants to seek an order of attachment

in the manner provided by the law of the state in which the district court sits."  *DLJ Mortg. Cap.,*

*Inc. v. Kontogiannis*, 594 F. Supp. 2d 308, 318 (E.D.N.Y. 2009).   New York law authorizes

prejudgment attachment pursuant to the CPLR §§ 6201(3) and 6212(a).  *See Prabir v. Bukhara*

*Indian Cuisine, Inc.*, No. 17-CV-3704 (AJN) (HBP), 2018 WL 2709231, at *2 (S.D.N.Y. May 17,

2018) (quoting C.P.L.R. §§ 6212(a), 6201(3)) (collecting cases), *report and recommendation*

*adopted,* 2018 WL 2694435 (S.D.N.Y. June 5, 2018).  Attachment is "a drastic remedy," and is

"strictly construed in favor of those against whom it may be employed."  *Ne. United Corp. v.*

*Lewis*, 137 A.D.3d 1387, 1388 (N.Y. App. Div. 2016); *see also Gen. Textile Printing & Processing*

*Corp. v. Expromtorg Int'l Corp.*, 862 F. Supp. 1070, 1073 (S.D.N.Y. 1994) ("Attachment is a harsh

---

as "both the preliminary and ultimate relief sought" by Plaintiff are "one in the same: vacating the
previous conveyances and returning title of the real property at issue to [the Original Defendants]."
*New Falls Corp.,* 2019 WL 4015170, at *12.  "If Plaintiff could obtain final equitable relief with
respect to these claims, then he could also obtain preliminary injunctive relief, as well."  *Dong*,
2018 WL 1445573, at *9.  Though the Court limits its relief here to an attachment order pursuant
to FRCP 64 and the CPLR, it notes that *Grupo Mexicano* would not bar further or alternative relief
in the form of a preliminary injunction pursuant to FRCP 65 and the DCL.

remedy, and should not be lightly granted by the court.").   A plaintiff seeking attachment under CPLR §§ 6201(3) and 6212(a) must demonstrate that

> (1) [he] has stated a claim for money judgment; (2) [he] has a probability of success on the merits; (3) the defendant, "with the intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered, or secreted property, or removed it from the state or is about to do any of these acts"[;] and (4) the amount demanded from the defendant is greater than the amount of all counterclaims known to plaintiff.

*DLJ Mortg. Cap., Inc.*, 594 F. Supp. 2d at 318–19 (quoting CPLR §§ 6201(3), 6212(a)).

Here, Plaintiff easily satisfies the first requirement; his FLSA and NYLL claims were for money damages.  The Court therefore turns to the other three requirements for attachment under the CPLR §§ 6201(3) and 6212(a).

### 1.   Defendants' Counterclaims

Plaintiff satisfies the requirement "that the amount demanded from [the Original Defendants] exceeds all counterclaims known to" him.  CPLR § 6212(1).  In assessing this requirement, "courts are to examine only counterclaims that the plaintiff concedes are just." *In re Hypnotic Taxi LLC*, 543 B.R. 365, 380–81 (Bankr. E.D.N.Y. 2016) (collecting cases).  Here, the Original Defendants asserted no counterclaims in their answer in the underlying FLSA and NYLL action (*see* Am. Answer, Dkt. 19) and did not dispute Plaintiff's contention that he had demanded an amount greater than all counterclaims (Pl.'s Mem., Dkt. 29, at 15).  It was only after Plaintiff brought his ASC seeking attachment and asserting fraudulent conveyance claims that Defendants responded with a faithless servant counterclaim, alleging that Plaintiff had stolen cash that customers left on the table and overcharged customers by modifying their receipts to give himself a larger tip after they had signed it.[6]  (ASC Am. Answer, Dkt. 91, at 11–13.)  "Whether these

---

[6] The Original Defendants' Amended Answer contained similar factual allegations that Plaintiff altered receipts "after they were signed by various customers in order to obtain a benefit,"

counterclaims exceed the amount demanded by [Plaintiff] is immaterial" because Plaintiff's

"demand exceeded all counterclaims when [he] brought this motion."[7] *Bank of China, N.Y. Branch*

*v. NBM L.L.C.*, 192 F. Supp. 2d 183, 187 n.1 (S.D.N.Y. 2002) (citations omitted).   This

requirement for attachment is therefore met.

### 2.   Intentional Fraud

As to the intentional fraud requirement of CPLR § 6201(3), Defendants maintain that

attachment of the five properties at issue is inappropriate because the transfers were made for

wholly innocent reasons unrelated to the Original Defendants' potential liability to Plaintiff.  (*See*

New Defs.' Mem., Dkt. 70, at 8–11; Original Defendants' Memorandum of Law in Support of

Defendants' Opposition to Plaintiff's Application for an Order to Attach ("Original Defs.' Mem."),

Dkt. 74, at 4–7, Brostowin Decl., Dkt. 75, at 7, 10–11.)  For the reasons that follow, the Court

finds these arguments unavailing.

"Because 'fraudulent intent is rarely susceptible to direct proof,' courts in the Second

Circuit have examined whether allegedly suspicious transactions exhibit 'badges of fraud' that

give rise to a sufficient inference of intent*." DLJ Mortg. Cap., Inc.*, 594 F. Supp. 2d at 320 (quoting

*In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983)) (citations omitted).  "The existence of several

---

but these allegations were made in the context of an affirmative defense, not a counterclaim.  (*See* Am. Answer, Dkt. 19, ¶¶ 51–55.)

[7] Even if the Original Defendants had brought their faithless servant counterclaim in their Amended Answer to Plaintiff's Original Complaint, the Court concludes that the counterclaims cannot exceed the amount demanded by Plaintiff.  "Under New York common law, a faithless servant forfeits the right to compensation for services tainted by their faithlessness." *Stefanovic v. Old Heidelberg Corp.*, No. 18-CV-2093 (LTS) (KNF), 2019 WL 3745657, at *2 (S.D.N.Y. Aug. 8, 2019) (citing *Phansalkar v. Andersen Weinroth & Co.*, 344 F.3d 184, 200 (2d Cir. 2003)). Without a showing of additional damages, the maximum that the Original Defendants could recover for their faithless servant claim is $81,144.98 (*see* Dkt. 74-5), which does not exceed the $599,870.85 that Plaintiff seeks to recover (*see* Winston's Second Decl., Dkt. 81, ¶ 9).

badges of fraud can constitute clear and convincing evidence of actual intent" to defraud creditors. *In re MarketXT Holdings Corp.*, 376 B.R. 390, 405 (Bankr. S.D.N.Y. 2007) (citing *In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005)).   Among the badges that courts consider are:

> (1) [T]he lack or inadequacy of consideration; the family, (2) friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*CF 135 Flat LLC v. Triadou SPV N.A.*, No. 15-CV-5345 (AJN), 2016 WL 5945912, at *10 (S.D.N.Y. June 24, 2016) (quoting *In re Kaiser*, 722 F.2d at 1582–83). "While the presence or absence of any particular badges of fraud is not determinative in finding fraudulent intent, 'the presence of multiple indicia will increase the strength of the inference.'" *Allstate Ins. Co. v. Mirvis*, No. 08-CV-4405 (PKC) (PK), 2018 WL 4921631, at *5 (E.D.N.Y. Sept. 4, 2018) (quoting *MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995)).

The Court finds that almost all badges of fraud are met as to almost all the property transfers.   First, the properties were transferred for virtually no consideration.   Although the deeds state that each transfer was made in consideration of ten dollars (*see* Dkt. 32-2, at ECF 4; Dkt. 32-5, at ECF 4; Dkt. 32-7, at ECF 4; Dkt. 32-15, at ECF 4; Dkt. 32-18, at ECF 4), a pittance in itself, deeds for the four transfers of real property stated that they were made for a full sale price of $0 (*see* Dkt. 32-2, at ECF 8; Dkt. 32-5, at ECF 9; Dkt 32-7, at ECF 8, Dkt. 32-15, at ECF 7).   "[I]t is of no moment whether the amount listed as consideration is zero dollars or ten dollars, as both are 'disproportionately small' when compared to" the property interest transferred.   *Kim v. Ji Sung*

*Yoo*, 311 F. Supp. 3d 598, 613 (S.D.N.Y. 2018) (quoting *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 377 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004)), *aff'd sub nom. Tae H. Kim v. Ji Sung Yoo*, 776 F. App'x 16 (2d Cir. 2019); *see also Deflora Lake Dev. Assocs., Inc. v. Hyde Park*, No. 13-CV-4811 (CS), 2016 WL 7839191, at *4 (S.D.N.Y. June 9, 2016) (finding ten dollars to be inadequate consideration for a conveyance of property), *aff'd*, 689 F. App'x 93 (2d Cir. 2017), and *aff'd*, 689 F. App'x 99 (2d Cir. 2017); *United States v. Alfano*, 34 F. Supp. 2d 827, 848 (E.D.N.Y. 1999) (same).

Second, all five properties were transferred from Original Defendants Wai Leung and Wai Shun to their immediate family members.  Wai Leung's interest in the Strickland Property was transferred to his wife, Po Kum.  (*See* Dkt. 32-2.)  Wai Leung's interest in the Condo was transferred to his son, Ronald.  (*See* Dkt. 32-5.)  The 6th Avenue Property was transferred from Wai Leung, Po Kum, and Roy (son of Wai Leung and Po Kum) to Roy and his wife, Jiazhen.  (*See* Dkt. 32-7.)  Wai Shun's interest in the 16th Avenue Property was transferred to his son, Joseph. (*See* Dkt. 32-15.)  Wai Leung's interest in the Li Mortgage was transferred to his wife, Po Kum, and Wai Shun's interest in the Li Mortgage was transferred to his son, Elton.  (*See* Dkt. 32-18.)

Third, it appears that, notwithstanding Wai Leung's and Wai Shun's transfers of their interests in the Strickland Property and the 16th Avenue Property respectively and their purported plans to relocate to China, they still retain possession, use, and control of those properties alongside their family member transferees.  The Original Defendants explain that Wai Leung and Wai Shun continue to reside at those properties only because of "the instant action and the worldwide pandemic" (*see* Original Defs.' Mem, Dkt. 74, at 5–6), but this explanation does not change the fact that "the transfer of property to a family member for no consideration, while continuing to use and enjoy the property, is a classic badge of fraud," *In re Herz*, 556 B.R. 537, 544 (Bankr. E.D.N.Y.

2016) (citing *In re Kaiser*, 722 F.2d at 1583). The Court also finds it irrelevant that Wai Leung's and Wai Shun's transferee spouses now apparently pay property taxes on the Strickland Property and 16th Avenue Property respectively (Declaration of Wai Leung Chan ("Wai Leung Decl."), Dkt. 74-1, ¶ 13), especially absent evidence that the taxes were paid from the wives' individual, rather than comingled, marital funds.

Finally, the timing and chronology of the transfers is extremely telling. On October 18, 2019, Plaintiff filed this action seeking judgment of almost $500,000. (*See* Compl., Dkt. 1.) Wai Leung and Wai Shun traveled to China from October 21, 2019 until November 15, 2019 (Dkt. 74-4), and the Original Defendants were served while Wai Leung and Wai Shun were abroad (Dkts. 8–12). (*See* Wai Leung Decl., Dkt. 74-1, ¶ 7.) On November 25, 2019, Wai Leung and Wai Shun transferred their interests in four of the five properties at issue—the Strickland Property, the Condo, the 6th Avenue Property, and the 16th Avenue Property. (*See* Dkts. 32-2, 32-5, 32-7, 32-15; *see also* New Defs.' Mem., Dkt. 70, at 2–6; Original Defs.' Mem., Dkt. 74, at 2–3; Brostowin Decl., Dkt. 75, at 6–7.) The next day, the Original Defendants requested an extension of time to file their responses to the Complaint. (Dkt. 13.) The day after that, Wai Leung and Wai Shun transferred their interests in the last of the five properties, the Li Mortgage. (Dkt. 32-18.) The Court finds this series of five property transfers over three days in the weeks following the Original Defendants' realization of their potential liability to Plaintiff to be a strong indicator of fraudulent intent and a persuasive badge of fraud.

In Wai Leung's declaration, he addresses the chronology of events by explaining:

In the beginning of 2019, I considered to retire [sic] and talked to Wai Shun and my families about my retirement plan. Wai Shun agreed with me and decided to retire with me. . . . Thus, we decided to spend our retired life in China after we disposed of the affairs here.

First, we decided to sell the restaurant. . . .

14

> About one week after the sale of the restaurant, Wai Shun and I booked the flight tickets to fly to China in October.  Meanwhile, we arranged an appointment with our closing attorney Mr. Joseph Wong in November shortly after we came back from China to transfer our interest in the real properties and the proceed[s] of the restaurant sale to our families. . . .
>
> We made these transfers as we scheduled in late September to prepare for our retirement.  In connection with inheritance arrangements, we transferred our interest in the real properties to our spouses and children.  Further, since we are going to spend most of our time in China, we will not be able to handle the matters here, [so] we also transferred the Li Mortgage to my wife and [Wai] Shun's child.

(Wai Leung Decl., Dkt. 74-1, ¶¶ 4, 5, 6, 12.)

The Court finds that although Wai Leung and Wai Shun began planning for their retirement in September 2019, as indicated by their sale of the Restaurant (*see* Dkt. 74-3), this fact does not sufficiently or convincingly explain away or rebut the overwhelming evidence of fraudulent intent.  First, Defendants provide no evidence that the November 25 and 27, 2019 property transfers had been anticipated prior to the filing of this action, and the chronology of events suggests otherwise.  Second, the Court does not find credible the assertions in Defendants' declarations that Wai Leung and Wai Shun plan to relocate full-time to China without their wives (as they claim) following their retirement.  (*See* Wai Leung Decl., Dkt. 74-1, ¶¶ 4, 12; Declaration of Po Kum Chan ("Po Kum Decl."), Dkt. 71, ¶ 5.)  The Court notes that, almost a year after their sale of the Restaurant, Defendants offer no evidence that Wai Leung and Wai Shun have followed through on their plans to relocate to China.  And third, even assuming that Wai Leung and Wai Shun *did* intend to relocate to China following their retirement, the Court is not persuaded, without more, that their relocation to China necessitated the five property transfers.[8]  With the backdrop of

---

[8] Defendants also argue that the transfers of the four real properties were not fraudulent because the transfers did not render Wai Leung and Wai Shun insolvent, as at the time of the transfers on November 25, 2019, Wai Leung and Wai Shun still retained their interests in the Li Mortgage and would thereby "not be rendered unable to pay any potential judgment in favor of Plaintiff."  (New Defs.' Mem., Dkt. 70, at 8–10.)  The Court finds this fact largely immaterial.  First, a transferor's solvency is irrelevant for intentional fraud analysis pursuant to CPLR

these general findings regarding the badges of fraud, the Court turns to Defendants' specific arguments as to each of the property transfers.

a.  Strickland Property

Counsel for the Original Defendants argued at the August 10, 2020 hearing that transferring the Strickland Property to be held solely in New Defendant Po Kum's name would make management of the property easier while Wai Leung was in China.  Po Kum explained in her declaration that she was "not comfortable with [Wai Leung's] frequent overseas trips and was not happy about his plan to retire to China."  (Po Kum Decl., Dkt. 71, ¶ 5.)  As evidence, Po Kum submitted that she had been making property tax and maintenance payments on the Strickland Property since its transfer.  The Court does not find this explanation credible, as Defendants offer no reason why Po Kum could make mortgage and property tax payments on the Strickland Property only after its transfer, and not when it was jointly held by herself and Wai Leung. Combined with the suspicious timing of the transfer and the other badges of fraud as discussed above, the Court finds that the Strickland Property was transferred with the intent to defraud Plaintiff of a potential judgment in his favor against Original Defendant Wai Leung.

b.  Condo

At the August 10, 2020 hearing, counsel for the Original Defendants informed the Court that the Condo was a rental property, and that New Defendant Ronald (one of Wai Leung and Po Kim's sons) had helped with its upkeep and maintenance since prior to the transfer.  (*See* New Defs.' Mem., Dkt. 70, at 9; Po Kum Decl., Dkt. 71, ¶¶ 8–10; Declaration of Ronald Chan ("Ronald Decl."), Dkt. 72, ¶ 5.)  In his declaration, Ronald explains that the transfer of the Condo "was done

---

§ 6201(3).  And second, this argument is undercut by the fact that Wai Leung and Wai Shun transferred their interests in the Li Mortgage two days later.  The Court also finds it immaterial that the transfers were completed over a three-day period rather than at the exact same time.

as an advance of [his] share of inheritance" (Ronald Decl., Dkt. 72, ¶ 6), and Po Kum states that

she and Wai Leung had "always intended to gift the Condo to Ronald" (Po Kum Decl., Dkt. 71,

¶¶ 8–10).  This explanation is undermined by the fact that Po Kum still holds a 50% interest in the

property (*see* Dkt. 32-5), so it has not been "gift[ed]" to Ronald.  Again, combined with the

suspicious timing of the transfer and the badges of fraud as discussed above, the Court finds that

the Condo was transferred with the intent to defraud Plaintiff of a potential judgment in his favor

against Original Defendant Wai Leung.

c.  6th Avenue Property

Defendants explain that the 6th Avenue Property was the residential home of New

Defendants Roy (Wai Leung and Po Kum's other son) and Jiazhen (Roy's wife), and that Wai

Leung and Po Kum were listed on the deed simply because they were co-signors for the mortgage.

(*See* Po Kum Decl., Dkt. 71, ¶¶ 11–12; Wai Leung Decl., Dkt. 74-1, ¶ 8.)  Po Kum states in her

declaration that

> Roy and [Jiazhen] have lived at the 6th Avenue Property since its purchase in 2013.
> They have retained exclusive control over it, made all mortgage payments, paid all
> property taxes, paid all utility bills, and paid for the repairs and improvements on
> the 6th Avenue Property. . . .
>
> In September 2019, Roy and [Jiazhen] were seeking to refinance the 6th Avenue
> Property.  They were advised by the bank that since their credit had improved, they
> would no longer need cosignors for the mortgage.  At the request of Roy [] and his
> wife, my husband and I agreed to assign our interest in the 6th Avenue Property to
> them, which we did on or about November 25, 2019.

(Po Kum Decl., Dkt 71, ¶ 12–13.)  At the show cause hearing, counsel for Defendants made

reference to evidence indicating that the bank issuing the second mortgage had suggested removing

Wai Leung and Po Kum from the deed.  No such evidence was submitted to the Court.

Nonetheless, Defendants provide evidence that Roy and Jiazhen had made mortgage and property

tax payments on the 6th Avenue Property since at least 2018 (Dkt. 73-1), oversaw improvements

17

and maintenance on the property since at least 2015 (Dkt. 73-2), intended to refinance the 6th Avenue Property since October 2019 (Dkt. 73-3), and originated this new mortgage on December 26, 2019 (Dkt. 73-4).

While the Court does not understand why Defendants Wai Leung and Po Kum were originally listed on the 6th Avenue Property deed if they were merely co-signors for the mortgage, the Court finds that the 6th Avenue Property was Roy and Jiazhen's home since long before the commencement of this action, and that Wai Leung and Po Kum's transfers of their interests in this property had the purpose of reflecting its true ownership and facilitating Roy and Jiazhen's second mortgage application.

d.   16th Avenue Property

Defendants explain that Wai Shun transferred his interest in the 16th Avenue Property to his son, Joseph, because Joseph "had just started his family and with a new baby [] he needed additional space for the family and child." (Brostowin Decl., Dkt. 75, at 7.)  Joseph submitted in his declaration that "[he] had conversations with [his] father, Wai Leung [], about the 16th Avenue Property for years leading up to its transfer and the intention was to transfer it at retirement.  This was done for advance inheritance purposes." (Declaration of Joseph Chan ("Joseph Decl."), Dkt. 75-2, ¶ 7 (quotations omitted).)  In light of the suspect timing of the transfer, the fact that both Wai Leung and Ching Man Hong appear to both still live at the 16th Avenue Property, and the fact that Ching Man Hong still holds a 50% interest in the 16th Avenue Property (Dkt. 32-15), the Court does not find this explanation credible.  Combined with the badges of fraud as discussed above, the Court finds that the 16th Avenue Property was transferred with the intent to defraud Plaintiff of a potential judgment in his favor against Original Defendant Wai Shun.

e. <u>Li Mortgage</u>

Defendants explain that Original Defendant Wai Leung transferred his interest in the Li

Mortgage to his wife, Po Kum, "so that [her] household expenses would be covered while [Wai

Leung] [was] away on his travels."  (Po Kum Decl., Dkt. 71, ¶ 15.)   This explanation is

unpersuasive as Defendants fail to explain why Po Kum would be unable to access their marital

funds while Wai Leung is in China, and the Court again notes that Defendants have offered no

evidence suggesting that Wai Leung did, in fact, relocate to China after his return to New York on

November 15, 2019.  (Dkt. 74-4.)   Defendants also claim that Wai Shun's interest in the Li

Mortgage was transferred to his son, Elton, "because he always wanted to help [Elton] to establish

himself to help build his professional life."  (Brostowin Decl., Dkt. 75, at 7; *see also* Elton Decl.,

Dkt. 75-1, ¶ 5 (same).)  The Court does not find this explanation credible in light of the suspicious

timing of the transfer and other badges of fraud as discussed above, and finds that the Li Mortgage

was transferred with the intent to defraud Plaintiff of a potential judgment in his favor against

Original Defendants Wai Leung and Wai Shun.

Accordingly, after considering these badges of fraud, the Court finds that the Strickland

Property, the Condo, the 16th Avenue Property, and the Li Mortgage were transferred with the

intent to "frustrate the enforcement of a judgment that might be rendered in [P]laintiff's favor."

CPLR § 6201(3).

3.    Probability of Success on the Merits

"Probability of success on the merits for purposes of an order of attachment requires that

the moving party demonstrate that it is more likely than not that it will succeed on its claims and

must show proof stronger than that required to make a prima facie case."  *Musket Corp. v. PDVSA*

*Petroleo, S.A.*, 512 F. Supp. 2d 155, 160 (S.D.N.Y. 2007) (citations omitted); *see also DLJ Mortg.*

*Cap., Inc.*, 594 F. Supp. 2d at 319 (same).  "The movant must make that showing 'by affidavit and

such other written evidence as may be submitted.'"  *Skyline Steel, LLC v. PilePro, LLC*, No. 13-CV-8171 (JMF), 2015 WL 5076695, at *3 (S.D.N.Y. Aug. 27, 2015) (quoting *Buy This, Inc. v. MCI Worldcom Commc'ns, Inc.*, 178 F.Supp.2d 380, 382 (S.D.N.Y. 2001)).  "In assessing whether a plaintiff can show a probability of success on the merits, 'the court must give the plaintiff the benefit of all the legitimate inferences that can be drawn from the facts.'"  *Silverman Partners, L.P. v. First Bank*, 687 F. Supp. 2d 269, 293 (E.D.N.Y. 2010) (quoting *Monteleone v. Leverage Grp.*, 2008 WL 4541124, at *6 (E.D.N.Y. Oct. 7, 2008)); *see also JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 306 F. Supp. 2d 482, 485 (S.D.N.Y. 2004) (same).

Notwithstanding the limited record at this stage in the litigation, Plaintiff has sufficiently demonstrated a probability of success on the merits of his FLSA and NYLL claims.[9]  Plaintiff brings the FLSA and NYLL minimum wage, FLSA and NYLL overtime pay, NYLL notice and recordkeeping, and NYLL wage statement claims against the Original Defendants on the basis that each was an employer within the meaning of the FLSA, 29 U.S.C. § 203(d), and the NYLL, N.Y. Lab. Law §§ 190(3) and 651(6), and employed Plaintiff within the meaning of the FLSA, 29 U.S.C. § 203(g) and the NYLL, N.Y. Lab. Law § 2(7).

a. <u>Employer Under the FLSA and NYLL</u>

Only an employer may be held liable for FLSA violations.  29 U.S.C. § 207(a)(1).  The FLSA defines "employer" broadly to include "any person acting directly or indirectly in the

---

[9] The Court analyzes Plaintiff's minimum wage claim under both the FLSA and NYLL together, as the relevant provisions under "[t]he NYLL and the FLSA are analytically nearly identical." *Coley*, 2018 WL 1513628, at *5; *see also Santillan v. Henao*, 822 F. Supp. 2d 284, 292 (E.D.N.Y. 2011) (noting that the NYLL is the "state analogue" to the FLSA and "otherwise mirrors the FLSA in compensation provisions regarding minimum hourly wages and overtime").

interest of an employer in relation to an employee." 29 U.S.C. § 203(d); *Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290, 296 (1985) (construing the FLSA liberally because broad coverage is essential to accomplish the FLSA's remedial goals). The Second Circuit has instructed that "the determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in economic reality rather than technical concepts, determined by reference not to isolated factors, but rather upon the circumstances of the whole activity." *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008); *see also Carter v. Dutchess Comm. Coll.*, 735 F.2d 8, 12 (2d Cir.1984) ("It is common ground that courts, in determining whether an employment relationship exists for purposes of the FLSA, must evaluate the 'economic reality' of the relationship."). Factors that courts evaluate pursuant to this economic realities test include

> whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.

*Carter*, 735 F.2d at 12 (citing *Bonnette v. Cal. Health and Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983)). No one factor is dispositive and the inquiry into an employment relationship is fact-intensive. *Barfield*, 537 F.3d at 141–43. Although these factors guide the Court's analysis, "employment for FLSA purposes [is] a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances." *Id.* at 141–42; *see also Irizarry v. Catsimatidis*, 722 F.3d 99, 105 (2d Cir. 2013) ("To the contrary . . . [the factors] provide a nonexclusive and overlapping set of factors to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA."). In addition to the factors listed above, the Court remains "free to consider any other

factors it deems relevant to its assessment of the economic realities" of the employer-employee relationship. *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 71–72 (2d Cir. 2003).

Defendants do not dispute that Original Defendant Wai Shun was Plaintiff's employer for FLSA and NYLL purposes, but maintain that Original Defendants Wai Leung and Wai Wen were not. (*See* Am. Answer, Dkt. 19, ¶¶ 11–14; Original Defs.' Mem., Dkt. 74, at 9–10.) In their Amended Answer to Plaintiff's Original Complaint, the Original Defendants admit to the allegation that Wai Shun "was an owner, manager, [and] officer" of Corporate Defendant China New Star, "managed the Restaurant, and had operational control of [Corporate Defendant] and the Restaurant," "had the power to hire and fire [P]laintiff, set the terms and conditions of his employment, and determine the rate and method of compensation in exchange for [P]laintiff's services" (Compl., Dkt. 1, ¶ 8), but clarified that Wai Shun was the Vice-President of Corporate Defendant China New Star, not a director (Am. Answer, Dkt. 19, ¶ 12). Defendants further denied the allegation in Plaintiff's Original Complaint that Wai Leung

> was an owner, manager, and officer and/or director of [Corporate Defendant China New Star], managed the Restaurant, and had operational control of [Corporate Defendant] and the Restaurant[,] . . . [and that] Wai Leung [] had the power to hire and fire [P]laintiff, set the terms and conditions of his employment, and determine the rate and method of compensation in exchange for [P]laintiff's services,

(Compl., Dkt. 1, ¶ 9). (Am. Answer, Dkt. 19, ¶ 13.) Defendants respond that Wai Leung "had no involvement in [Corporate Defendant China New Star]'s operations and hiring decisions, and that he [had] not worked at [the Restaurant] for over twenty-five years and had no involvement in making operating decisions for [Corporate Defendant]." (*Id.*) Finally, Defendants denied the allegation in Plaintiff's Original Complaint that Wai Wen

> was an owner, manager, and officer and/or director of [Corporate Defendant China New Star], managed the Restaurant, and had operational control of [Corporate Defendant] and the Restaurant[,] . . . [and that] [Wai Wen] had the power to hire and fire [P]laintiff, set the terms and conditions of his employment, and determine

the rate and method of compensation in exchange for [P]laintiff's services.  [Wai Wen] hired [P]laintiff in December 2012 to work as a waiter [at the restaurant],

(Compl., Dkt. 1, ¶ 10).  (Am. Answer, Dkt. 19, ¶ 14.)  Defendants respond that Wai Wen "was

only an employee" at the Restaurant, "employed as a bartender,"

> was never a shareholder of [Corporate Defendant], and did not hold any office or position on the board of directors of the company.  [Wai Wen] had no authorization to hire, dismiss, determine or give wages to any of China New Star Inc.'s employees.  Upon information and belief, Plaintiff was hired by and wages were distributed by Wai Shun.

(*Id.*)

Notwithstanding the dispute over whether Original Defendants Wai Leung and Wai Wen

were properly considered Plaintiff's employers for FLSA and NYLL purposes, the Court finds that

Plaintiff has sufficiently "demonstrate[d] by affidavit that it is more likely than not that [he] will

succeed on [his] claims."  *DLJ Mortg. Cap., Inc.*, 594 F. Supp. 2d at 319 (citation omitted).  In his

declaration, Plaintiff described as follows:

> I was hired by Defendant Wai Wen Chan, who also hired other workers for the Restaurant.  After I was hired, Wai Wen Chan told me what my schedule would be and how much I would be paid. . . .
>
> I continued working as a waiter in the Restaurant until August 29, 2019 when I was terminated.  I was fired by Defendant Wai Shun Chan. . . .  Wai Wen Chan, Wai Shun Chan, and [] Wai Leung Chan are brothers who owned, operated and managed the Restaurant while I was employed there.
>
> . . .
>
> I was generally paid on Sundays (for the prior week of work) in cash by Wai Shun Chan.  Wai Shun Chan was in charge of the Restaurant on Sundays, but if he was unavailable (for example, if he was on vacation), I would then be paid in cash by Wai Leung Chan, who many times covered for Wai Shun Chan in the Restaurant if Wai Shun Chan was not available on a Sunday or by Wai Wen Chan on Monday when he was in charge of the Restaurant.
>
> . . .
>
> During the time period I worked at the Restaurant, the three brothers (the individual Defendants) maintained a general schedule for when each handled the management of the Restaurant—supervising and being in charge of all of the Restaurant

employees as well as handling and being in charge of the Restaurant operations. This schedule was as follows: Wai Shun Chan would manage the Restaurant and its employees all day on Sundays and for half-a-day on Thursdays and Saturdays, and would open the Restaurant on Sunday and close it on all three of those days; Wai Leung Chan would manage the Restaurant and its employees for one-half day every Friday and would close the Restaurant on that day; and[] Wai Wen Chan would manage the Restaurant and its employees all day on Mondays, Tuesdays and Wednesdays and for half-a-day on Thursdays, Fridays and Saturdays, and would open the Restaurant on each of those days and close it on Mondays, Tuesdays and Wednesdays. But[] there were a number of times when this scheduled changed. For example, at times, one brother [would] cover a time period in the Restaurant—and be in charge of the Restaurant and its employees—that another brother would otherwise cover under the general schedule. In this regard—to provide one example—Wai Leung Chan would many times cover the Restaurant—including paying employees their wages, handling employee scheduling issues, and supervising and being in charge of the employees—when Wai Shun Chan or Wai Wen Chan [were] on vacation.

During the time periods each brother managed the Restaurant, he would have the authority to deal with all aspects of the Restaurant employees' employment, including supervising and directing them in their work, setting or changing their schedule, deciding whether to hire or fire an employee, and determining how much an employee would be paid. I myself experienced a change in schedule authorized by each of the brothers. . . . To arrange a day off, I would ask one of the brothers (whomever was in charge of the Restaurant on the particular day I made my request) if I could have a day off later in the week or month. During my employment at the Restaurant, I made this request of each of the brothers; each had the authority to grant or deny the request and each at one time or another granted my request. Each brother also determined scheduling issues for other Restaurant employees when he was in charge of managing the Restaurant. Further, each brother, when he was in charge of the Restaurant, would direct the employees—including me—regarding their work. . . . [T]o state it simply[,] each brother had full supervisory control over the Restaurant employees on the days he was in charge of the Restaurant. Each brother had the authority to hire and fire Restaurant employees, and I saw Wai Shun Chan and Wai Wen Chan at times hire employees, and observed Wai Shun Chan fire employees (in addition to me).

(Declaration of Yong Xiong He ("He Decl."), Dkt. 30, ¶¶ 2–10 (citations omitted).)

While discovery may reveal that Original Defendants Wai Leung and Wai Wen were

merely President[10] of Corporate Defendant and a bartender employed by Corporate Defendant

---

[10] "Evidence that an individual is an owner or officer of a company, or otherwise makes corporate decisions that have nothing to do with an employee's function, is insufficient to demonstrate 'employer' status. Instead, to be an 'employer,' an individual defendant must possess

respectively, at this point in the litigation, the Court cannot—and should not—adjudicate the merits of Plaintiff's argument that all Original Individual Defendants were his employer for FLSA and NYLL purposes.  The Court does find, however, that at this preliminary stage of the proceedings, Plaintiff has sufficiently demonstrated a probability that all Original Individual Defendants "had the power to hire and fire the employees," "supervised and controlled employee work schedules or conditions of employment," and "determined the rate and method of payment."  *See Carter*, 735 F.2d at 12 (internal quotation marks and citation omitted).

### b.  Unpaid Wages and Overtime Pay

The FLSA provides that "[e]very employer shall pay to each of his employees" a minimum wage, 29 U.S.C. § 206(a), and that, with certain exceptions not relevant here,

> no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed,

*id.* § 207(a)(1).  Both provisions are limited to employees who are "engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce."  *Id.* §§ 206(a), 207(a)(1).[11]  An employee bears the burden

---

control over a company's actual 'operations' in a manner that relates to a plaintiff's employment." *Irizarry*, 722 F.3d at 109.

[11] Plaintiff avers that his employers qualified for both individual and enterprise coverage under the FLSA.  (*See* Pl.'s Mem., Dkt. 29, at 11.)  "Enterprise coverage applies when an employer, *inter alia*, grosses at least $500,000 in annual sales."  *Padilla v. Manlapaz*, 643 F. Supp. 2d 298, 300 (E.D.N.Y. 2009) (citing 29 U.S.C. § 203(s)(1)(A)(ii)).  Plaintiff provides evidence that the Restaurant's annual revenues exceed $500,000.  (*See* Winston Decl., Ex. D, Dkt. 35-4, at ECF 2.) Individual coverage applies where

> the employees are "engaged in commerce or in the production of commerce."  The FLSA defines "commerce" as "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place

of establishing that he is covered under the FLSA.[12]  *See Locke v. St. Augustine's Episcopal Church*, 690 F. Supp. 2d 77, 84 (E.D.N.Y. 2010).

Plaintiff alleges that he was employed by the Original Defendants from December 2012 until August 29, 2019.  (Compl., Dkt. 1, ¶ 5; *but see* He Decl., Dkt. 30, ¶ 2 (noting that Plaintiff started working at the Restaurant on January 20, 2013).)  Plaintiff stated in his declaration:

> I worked a regular schedule in the Restaurant which repeated every three weeks during the entire time I was employed at the Restaurant: For two weeks, I would work sixty hours a week—ten hours a day—with Tuesdays off.  Then, for the third week, I would work fifty hours—also ten hours a day—with Tuesday and Thursday off.  I would then again work two sixty-hour weeks, followed by a fifty-hour week—and on and on like that every three weeks.  Every day I had one short 15-minute meal period, but I had to work during that time-period if there were customers in the Restaurant, which was oftentimes the situation.
>
> . . .
>
> I was paid twenty dollars ($20) for each day of work.  This meant that I was paid $120 per week for those weeks in which I worked six days (sixty hours) and $100 per week for those weeks in which I worked five days (fifty hours).  I was not paid extra for hours in which I worked more than forty hours in a week.

(He Decl., Dkt. 30, ¶¶ 4, 6.)

---

outside thereof."  In order to determine if individual coverage of the FLSA applies, courts must examine the employment actions of each employee asserting a claim.

*Padilla*, 643 F. Supp. 2d at 300 (quoting 29 U.S.C. § 203(b)).  Plaintiff maintains that individual coverage applies because Plaintiff "handled supplies or equipment that originated out-of-state." (Pl.'s Mem., Dkt. 29, at 11 (quoting *Rodriguez v. Almighty Cleaning, Inc.*, 784 F. Supp. 2d 114, 121 (E.D.N.Y. 2011)).)

Defendants do not dispute that Original Defendants are at least in part covered under the FLSA, and the Court finds that Plaintiff has sufficiently demonstrated that FLSA coverage applies. *See, e.g.*, *Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 32 (E.D.N.Y. 2015) ("Plaintiffs' respective jobs as waiter, kitchen helper/food preparer, cook and dishwasher all constitute non-exempt employment under the FLSA.").

[12] Under the NYLL, the analysis of a wage-and-hour claim is similar to that under the FLSA, "except that the NYLL does not require plaintiffs to show a nexus with interstate commerce or a minimum amount of annual sales."  *Tackie v. Keff Enter., Inc.*, No. 14-CV-2074 (JPO), 2014 WL 4626229, at *2 n.2 (S.D.N.Y. Sept. 16, 2014).

Defendants argue that Plaintiff has not sufficiently demonstrated a probability of success on the merits of his FLSA and NYLL claims because the description of Plaintiff's work schedule in his declaration is inconsistent from that in his Complaint.  (*See* New Defs.' Mem., Dkt. 70, at 11–12; Original Defs.' Mem., Dkt. 74, at 7–10; Brostowin Decl., Dkt. 75, at 12–13; Declaration of Yimin Chen, Dkt. 74-2, ¶ 11).).  The Court acknowledges these inconsistencies—Plaintiff alleges in his Complaint that he was paid $110 for 55 hours of work per week (Compl., Dkt. 1, ¶¶ 16–17), but describes in his declaration a three-week work cycle during which he was paid $120 per week for two 60-hour work weeks, followed by $100 per week for one 50-hour work week. (He Decl., Dkt. 30, ¶¶ 4, 6).  The Court does not find these discrepancies to be material, however, especially in light of Plaintiff's use of a translator.  (*See id.* ¶ 14; Declaration of Daniel Mei, Dkt. 31.)  Furthermore, the allegations in both the Complaint and Plaintiff's declaration state a claim for unpaid overtime wages; determinations of credibility cannot and should not be resolved by the Court at this stage of the proceedings.

For the period in question, the federal minimum wage was $7.25 per hour and the New York State minimum wage for workers in New York City ranged from $7.15 per hour to $15 per hour.  *See* 29 U.S.C. § 206(a)(1)(C); N.Y. Lab. L. § 652(1).  According to Plaintiff's calculations based on the higher of the federal and New York minimum wages and his estimates of his hours worked, Plaintiff should have been compensated $23,272.50 in 2013; $26,520 in 2014; $28,962.50 in 2015; $30,060 in 2016; $36,465 in 2017; $43,225 in 2018; and $32,475 in 2019.  (*See* Dkt. 80-1.)[13]  Instead, Plaintiff estimates that he was paid $5,600 in 2013; $5,780 in 2014; $5,780 in 2015;

---

[13] The Court notes that Plaintiff erroneously based his calculations on a $7.25 New York minimum wage in 2013 (*see* Dkt. 80-1), though the New York minimum wage between January 1, 2007 and December 31, 2013 was $7.15.  *See* N.Y. Lab. L. § 652(1).  This error does not affect his entitlement to damages, however, as the federal minimum wage was $7.25, *see* 29 U.S.C. § 206(a)(1)(C), and the higher minimum wage controls, *Galeana v. Lemongrass on Broadway*

$5,820 in 2016; $5,780 in 2017; $5,800 in 2018; and $3,780 in 2019.  (*Id.*)  To rebut these allegations, Defendants submitted copies of Plaintiff's W-2 Wage and Tax Statement forms from 2013 until 2019, which reflect that Plaintiff was paid $5,200 in 2013; $7,800 in 2014; $7,800 in 2015; $7,800 in 2016; $7,800 in 2017; $8,433.88 in 2018; and $7,360 in 2019.[14]  (Dkt. 74-5.) Defendants point to the discrepancies between Plaintiff's estimated payments and the amounts reported in the W-2s, but the Court does not find that these discrepancies undermine Plaintiff's probability of success on the merits.  While Plaintiff will have to eventually reconcile the differences between the allegations in his Complaint and declaration with the payment statements in his W-2s (Dkt. 74-5) when calculating damages, the Court notes that the W-2 statements themselves provide evidence that Plaintiff was underpaid pursuant to the FLSA and NYLL.

Based on Plaintiff's submissions and the evidence of Plaintiff's wages in the record, the Court finds that Plaintiff has demonstrated a probability of success on the merits of his FLSA and

---

*Corp.*, 120 F. Supp. 3d 306, 317 (S.D.N.Y. 2014) ("[P]laintiffs may recover the minimum wage at the rate set by state or federal law, whichever is greater." (citation omitted)).

[14] The FLSA and NYLL both "permit an employer to pay a tipped [employee] a cash wage that is lower than the statutory minimum wage, provided that[, *inter alia*,] the cash wage and the employee's tips, taken together, are at least equivalent to the minimum wage." *Inclan v. New York Hosp. Grp., Inc.*, 95 F.Supp.3d 490, 497 (S.D.N.Y. Mar. 26, 2015) (citations omitted).  But "[a]n employer may not take a tip credit under the FLSA unless the employer has 'inform[ed] the employee of the [statute's] tip credit provision.'" *Salinas v. Starjem Rest. Corp.*, 123 F. Supp. 3d 442, 465 (S.D.N.Y. 2015) (quoting *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 287 (S.D.N.Y. 2011)).  "The employer 'bears the burden of showing that it satisfied the FLSA's notice requirement by, for example, providing the employee with a copy of [29 U.S.C.] § 203(m) and informing the employee that her tips will be used as a credit against the minimum wage as permitted by law.'" *Id.* at 465–66 (quoting *He v. Home on 8th Corp.*, 09-CV-5630, 2014 WL 3974670, at *5 (S.D.N.Y. Aug. 13, 2014)) (alterations, internal quotation marks, and citation omitted).  The amounts reported in Plaintiff's W-2 statements reflect his total wages, tips, and other compensation (*see* Dkt. 74-5), but the Court notes that Plaintiff alleges in his declaration that he was not informed of whether the amount he earned would be claimed as part of his minimum wage (He Decl., Dkt. 30, ¶ 12).  Because Defendants have proffered no evidence that Plaintiff was provided the requisite tip-credit notice, the Court has cited only the non-tip wages reported in Plaintiff's W-2 statements.

NYLL claims, and thus fulfills the requirements for attachment pursuant to FRCP 64 and CPLR §§ 6201(3), 6212(a). The Court finds attachment warranted given its finding of the Original Defendants' fraudulent intent in making four of the five transfers, and the uncertainty of Plaintiff's ability to enforce a potential judgment in his favor if the properties are disposed of during the pendency of the original action.

### 4.   Joint and Several Liability

Plaintiff seeks to hold the Original Defendants jointly and severally liable. Corporations and individuals with operational control over employees both fit the definition of "employer" under the FLSA and NYLL. *Khurana v. JMP USA, Inc.*, 14-CV-4448 (SIL), 2017 WL 1251102, at *9 (E.D.N.Y. Apr. 5, 2017). Courts have held that establishing joint and several liability under the FLSA and NYLL requires no further analysis. *See Ansoumana v. Gristede's Operating Corp.*, 255 F. Supp. 2d 184, 189 (S.D.N.Y. 2003) ("'[J]oint employment' arises when the employee 'performs work which simultaneously benefits two or more employers' and 'one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee.'" (quoting 29 C.F.R. § 791.2(b))); *see also Rodriguez v. Almighty Cleaning, Inc.*, 784 F.Supp.2d 114, 129 (E.D.N.Y. 2011) (same). Thus, all of the Original Defendants may be held jointly and severally liable for the entire amount of damages awarded if Plaintiff prevails.

Plaintiff seeks judgment of at least $599,870.85 against the Original Defendants, jointly and severally. (Winston's Second Decl., Dkt. 81, ¶ 9.) In a supplemental letter to the Court, the Original Defendants offer to reverse the transfers of the Li Mortgage and the 16th Avenue

Property, which is valued at over $760,000.[15]  (Dkt. 78, at 1.)  However, "[u]nder joint and several liability, a plaintiff may recover anywhere from a portion of damages to the entirety of the damages against any one defendant."  *Kotuwage v. NSS Petroleum Inc.*, No. 15-CV-4374 (FB) (ST), 2018 WL 1189332, at *12 (E.D.N.Y. Feb. 8, 2018), *report and recommendation adopted as modified sub nom. Mudun Kotuwage v. Bilt Petroleum, Inc.*, No. 15-CV-4374 (FB) (ST), 2018 WL 1187397 (E.D.N.Y. Mar. 7, 2018) (citation omitted).  While attaching the Li Mortgage and the 16th Avenue Property would be sufficient to satisfy the entire judgment sought in this case, it is insufficient to ensure Original Defendant Wai Leung's ability to satisfy the entire judgment.  The Court therefore attaches the Li Mortgage, the 16th Avenue Property, and the Strickland Property.[16]

     5.   Undertaking

CPLR § 6212(b) requires a plaintiff seeking an order of attachment "to provide an 'undertaking' as security for (1) costs and damages incurred by the defendant in the event that the court subsequently determines that the plaintiff was not entitled to an attachment or if defendant ultimately recovers judgment; and (2) certain fees incurred by the sheriff."  *Herzi v. Ateliers De La Haute-Garonne*, No. 15-CV-7702 (RJS), 2015 WL 8479676, at *3 (S.D.N.Y. Oct. 13, 2015) (citing CPLR §§ 6212(b), 8011).   "The amount of the undertaking must be at least $500 but

---

[15] The 16th Avenue Property was originally owned by Wai Shun and Ching Man Hong. Thus, undoing the transfer thereof leaves approximately $380,000 in value from which Plaintiff may recover for Wai Shun's potential liability.

[16] Because the Court finds attachment pursuant to FRCP 64 and CPLR §§ 6201(3) and 6212 sufficient to protect Plaintiff's interest in the event of judgment in his favor, the Court finds no need to issue a preliminary injunction pursuant to FRCP 65 and the DCL.  *See Almontaser v. N.Y.C. Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008) ("The district court has wide discretion in determining whether to grant a preliminary injunction." (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)).

otherwise is within the discretion of the court." *BSH Hausgerate, GmbH v. Kamhi*, 282 F. Supp. 3d 668, 672 n.2 (S.D.N.Y. 2017) (citing CPLR § 6212(b)).

Courts frequently set the undertaking as a fraction of a percent of the value of the attachment. *See, e.g.*, *OSRecovery, Inc. v. One Groupe Int'l, Inc*., 305 F.Supp.2d 340, 348 (S.D.N.Y. 2004) (setting undertaking at 0.04% of the value of the attachment); *Disney Enterprises, Inc. v. Finanz St. Honore, B.V.*, No. 13-CV-6338 (NG) (SMG), 2017 WL 1862211, at *4 (E.D.N.Y. May 8, 2017) (setting undertaking at 0.5% of the value of the attachment); *Herzi*, 2015 WL 8479676, at *3 (setting undertaking at 0.67% of the value of the attachment); *In re Amaranth Nat. Gas Commodities Litig.*, 711 F. Supp. 2d 301, 313 (S.D.N.Y. 2010) (setting undertaking at 0.35% of the value of the attachment); *but see N.Y. Dist. Council of Carpenters Pension Fund v. KW Const., Inc.*, No. 07-CV-8008 (RJS), 2008 WL 2115225, at *6 (S.D.N.Y. May 16, 2008) (setting undertaking at 4.5% of the value of the attachment). The Court finds that, given the nature of the properties, *i.e.*, a mortgage contract and residential properties that Defendants have lived and continue to live in, there is minimal need for security to cover costs and damages incurred by Defendants during the pendency of the FLSA and NYLL action. Plaintiff requests that the undertaking be set at the $500 minimum amount, given his current unemployment and the prior inadequate compensation he received from the Original Defendants for six years. (Pl.'s Mem., Dkt. 29, at 16 n.10.) The Court grants Plaintiff's request and sets an undertaking of $500.

## IV.  Disclosure Pursuant to CPLR § 6220

CPLR § 6220 provides that "after the granting of an order of attachment[,] . . . the court may order disclosure by any person of information regarding any property in which the defendant has an interest, or any debts owing to the defendant." *Etalon Imob S.R.L. v. Schoenbach*, No. 12-CV-6868 (BSJ), 2012 WL 4741595, at *5 (S.D.N.Y. Oct. 3, 2012) (citing C.P.L.R. § 6220).

Plaintiff seeks such disclosure (Pl.'s Mem., Dkt. 29, at 24), and the Original Defendants oppose it only on the ground that, at the time they submitted their Memorandum of Law in Opposition to Plaintiff's motion, "Plaintiff's request for an attachment order ha[d] not been granted yet." (Original Defs.' Mem., Dkt. 74, at 16.)  As the Court issues an attachment order here, it may order disclosure pursuant to CPLR § 6220.  However, because the Court has authorized attachment of properties sufficient in value to satisfy Plaintiff's asserted entitlement to relief, the Court does not find "that Plaintiffs have demonstrated the need to better assess Defendants' asset holdings and ability to satisfy a judgment." *Schoenbach*, 2012 WL 4741595, at *5.  If, following this Order, "attachment remains unsatisfied, the Court may order depositions." *Swift Spinning Mills v. B&H Apparel*, No. 00-CV-652 (AKH), 2003 WL 942610, at *4 (S.D.N.Y. Mar. 6, 2003), *aff'd sub nom. Swift Spinning Mills, Inc. v. B & H Apparel Corp.*, 96 F. App'x 761 (2d Cir. 2004).

## CONCLUSION

For the foregoing reasons, the Court grants in part Plaintiff's motion for an order of attachment, and issues attachment pursuant to FRCP 64 and CPLR §§ 6201(3) and 6212 of: (i) the Strickland Property (6309 Strickland Ave, Brooklyn, NY); (ii) the 16th Avenue Property (8804 16th Ave, Brooklyn, NY); and (iii) the Li Mortgage.  Plaintiff is directed to post an undertaking in accordance with CPLR § 6212(b) in the sum of $500 within fourteen (14) days of this Order.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: October 22, 2020
       Brooklyn, New York